**DERWELL COMPANY, a Delaware corporation, Plaintiff,**

v.

**APIC, INC., and Atlas Chemical Industries, Inc., Delaware corporations, Defendants.**

Court of Chancery of Delaware, New Castle.

May 20, 1971.

James M. Tunnell, Jr., and Paul P. Welsh, of Morris, Nichols, Arsht & Tunnell, Wilmington, for plaintiff.

Edmund N. Carpenter, II, and Richard J. Abrams, of Richards, Layton & Finger, Wilmington, for defendants.

SHORT, Vice Chancellor:

Derwell Company (Derwell) brings this action for specific performance of a written contract for the sale and purchase of 45 acres of undeveloped land near the City of Newark. Defendants are Atlas Chemical Industries, Inc. (Atlas), assignee, and Atlas wholly-owned subsidiary, Apic, Ind. (Apic), the purchaser named in the contract. This is the decision after final hearing.

In the summer of 1968 Atlas, having determined to expand its Stuart Pharmaceutical Division in the east, instructed a local realtor, Harry Tingle, to explore prospective building sites in the area. Among those shown to Atlas representatives was the Derwell tract. On the visit there Tingle, in response to inquiry as to the availability of utilities, "indicated that there was a sewer connection [to the City of Newark sewer system] approximately three-quarters of a mile from the tract and that water would be no problem." Thereafter Atlas determined to buy the Derwell tract as the site, in part, for its plant, expecting to acquire additional adjacent lands to make up a parcel of approximately 150 acres. In order to avoid increased land costs of adjacent properties Atlas shielded its identity behind the Apic shell, formed specifically for the purpose of entering into the contract to purchase from Derwell. The contract was executed on August 14, 1968. It provided, inter alia:

"7. It is agreed that Buyer's obligation to accept the conveyance of the property at settlement is subject to a rezoning of the premises by appropriate final county ordinance to a General Industrial (M–2) zoning classification, as provided in the Zoning Code of New Castle County, Delaware, on or before one year from the date of execution hereof. To this end Buyer agrees that it will, within ninety (90) days after execution hereof submit an application for a change of zoning of the premises to M–2 and that it will thereafter diligently pursue the granting of such change in zoning. Seller agrees that it will cooperate in any manner requested by Buyer in seeking the aforesaid change in zoning. In the event Buyer is unable to obtain the change in zoning within one year from the date of execution hereof, Buyer, at its sole election may elect, within ten (10) days after the expiration of said one-year period, to terminate its rights and obligations under this Agreement by tendering back to Seller all executed copies of this Agreement * * *." *

In December 1968 Apic assigned its interest in the contract to Atlas and on January 6, 1969 Atlas formally applied for rezoning. In the meantime the secrecy of Atlas' interest was maintained and it made no investigation of sewer facilities available to the Derwell tract. After the filing of the rezoning application a number of problems appeared. Two civic organizations announced opposition; the planning authorities indicated that a major change in the county's comprehensive plan would be required; and the State Highway Department expressed concern about increased traffic volume. Plaintiff concedes that Atlas made every reasonable effort, with these problems in mind, to both privately negotiate and publicly carry its burden of proof at the hearing on March 4, 1969 before the New Castle County Planning Board.

Atlas had originally planned to start construction of the Stuart facility in the spring of 1969. The pressure of this plan coupled with the uncertainty of the rezoning of Derwell led Atlas to explore alter-

* The 90 day period within which Apic was required to submit an application for rezoning was subsequently extended to 150 days.

native sites after the date of the hearing. Atlas located the Lloyd-Murray tract, which provided more land and fewer problems with rezoning than Derwell. The respective advantages of the Lloyd-Murray tract were already in mind when Atlas received news for the first time on March 20 that connection to the Newark sewer system would not be possible. The New Castle County Planning Department considered the Newark line overburdened and had decided that a three-mile gravity line to connect with the county sewer at Glasgow would be necessary. Furthermore, in order to justify a major change in the comprehensive plan, the Department would require that a sewer line large enough to accommodate the future demands of the entire area would be needed, the cost of the line to be borne by Atlas.

The Glasgow line was roughly estimated by Atlas personnel to cost over $500,000 for a 30 inch pipe large enough to service the entire area as compared to a $65,000 cost for a tie-in with the Newark system. The cost of constructing an 8 inch line to Glasgow to service Atlas' own needs was later determined to be $210,000.

In light of the devolping sewer problem Atlas moved ahead with plans to purchase the Lloyd-Murray tract. The Planning Department remained adamant· on the sewer question and Atlas applied on April 11, to rezone the Lloyd-Murray lands "in lieu of" the Derwell property, its letter application stating that the Stuart plant would be built on Lloyd-Murray if rezoning was obtained and that "further studies indicate that the cost of utilities for the Derwell property will be prohibitive." At this time Atlas, having decided that the prospect of obtaining rezoning for Derwell was doubtful, requested the Planning Department to "shelve" the Derwell application. On April 30 Atlas advised Derwell that it "would not be proceeding with the acquisition of the Derwell property" and on June 3 informed the Planning Board that it "had abandoned efforts as to the Derwell property" and "would likely withdraw [its] petition to rezone that site."

Though Atlas learned on or about June 30, 1969 that the Planning Board's recommendation to the County Council would be against the rezoning of Derwell, formal recommendation was not issued by the Planning Board until July 17. In the meantime this litigation was commenced. On August 5 Atlas offered to continue the rezoning effort before the County Council but because of a County ordinance providing for a three-year moratorium on ordinances to rezone following denial of an application the parties agreed to postpone hearing before the Council and ultimately agreed to withdraw the rezoning ordinance.

Plaintiff contends that Atlas failed to perform its obligation to "diligently pursue" rezoning of Derwell and that its advice to plaintiff in the April 30, 1969 letter that "it would not be proceeding with the acquisition of the Derwell property" was a repudiation and anticipatory breach of the contract which was not excused by Atlas' subsequent offer to perform.

Atlas contends that it did diligently pursue its application to rezone Derwell and that, in any event, it is excused from performance.

■ As used in the contract here involved the requirement to diligently pursue the change of zoning contemplates not only the continuing effort to obtain that object but, by necessary inference, the forbearance from activity calculated to impede or prevent its attainment. Otherwise, the requirement would be meaningless. That Atlas activity on and after April 11, 1969 was designed to secure an unfavorable Planning Board recommendation on its Derwell application is evident from the record. This design was generated by the sudden appearance of the sewer problem, the discovery of the Lloyd-Murray properties which Atlas regarded as not only presenting fewer problems zoningwise but as more suitable than Derwell as the site for its plant, and its time schedule for commencing construction. Thereafter Atlas applied to rezone Lloyd-Murray "in lieu of" Derwell as the

site for its Stuart plant, requested the planning authorities to "shelve" the Derwell application and advised the Planning Board that it had "abandoned" efforts as to Derwell with the likelihood that the application would be withdrawn. It is little wonder that the Planning Board acted unfavorably on the Derwell application. But Atlas argues that its activities did not contribute to the unfavorable recommendation. It points to testimony of Richard M. Bauer, Director of the Department of Planning of New Castle County, to that effect. That testimony is not persuasive. Not only is it difficult to believe but it is contradicted, in part, by another member of the Planning Department who was the author of the report made by that agency and the Planning Board to the County Council. Moreover, the reasons stated in the report recommending unfavorable action refer in the main, not to planning or rezoning, but to costly difficulties which would confront Atlas in providing utilities for Derwell. This together with the Planning Board's knowledge that Atlas had abandoned its efforts with respect to Derwell clearly contributed to the recommendation.

■ Defendant contends that its April 30, 1969 letter advising Derwell that it would not be proceeding with the acquisition of the Derwell property should not be construed as "a unilateral withdrawal by Atlas from the proposed transaction." The intent of the letter, says Atlas, was merely to advise Derwell "of the insuperable obstacles which had arisen, making it futile to proceed further." But whatever may have been Atlas' intent the language in which the letter was cast could only be construed as an unequivocal renunciation and anticipatory breach of the contract. Atlas urges that in any event the breach was cured by its offer on August 5 to go forward. However, this action was pending at the time of the offer and Atlas' attempted withdrawal of its repudiation of the contract was, therefore, ineffective. Restatement, Contracts, § 319; 4 Corbin on Contracts § 980; Miller & Sons Bakery Co. v.

Selikowitz, 8 N.J.Super. 118, 73 A.2d 607; Quivirian Development Co. v. Poteet, 8 Cir., 268 F.2d 433.

■ Atlas contends that it is excused from performance because of mistake of fact as to the availability of sewer facilities and obstacles to rezoning. It argues that it was misled by Tingle's "innocent remarks as to the ready availability of sewer facilities from Newark." The difficulty with this argument is that it is not supported by the evidence. The testimony is clear that Tingle, on his visit with Atlas' personnel to the Derwell property, did no more than point out the existence of a sewer connection to the Newark system. His remarks cannot be taken as a representation that Atlas would be permitted to tie in to that system. That Atlas did not so consider those remarks is evident from the fact that up to, and even after, the date of execution of the contract it was pressing Tingle to investigate the availability of utilities. If Atlas was mistaken in its belief as to available sewer facilities the mistake was attributable to its own neglect, in the interest of secrecy, to resolve the issue before entering into the contract.

■ The obstacles to rezoning which Atlas says were not contemplated were opposition of civic organizations, concern of the State Highway Department, major amendment to the Comprehensive Development Plan and the expense of water and sewer to comply with county demands. Opposition of civic groups to rezoning applications is not unusual. The opposing groups here were concerned not so much with a plant such as Atlas proposed but with possible repetition of a recent experience with an M–2 quarry operation in the neighborhood. To alleviate these fears Atlas, after satisfying itself that its plant could be built under the more restricted M–1 zoning, amended its application to provide for M–1 and assured the civic groups that it would join them in opposing any such operation as a quarry. In the circumstances the opposition could have been no more

than mild at best and without significant effect on the outcome of the application to rezone.

The Highway Department did oppose rezoning of the Derwell tract. It considered that a major change in the Comprehensive Development Plan would create problems in the highway system of the area. But Atlas understood that its presentation at the March 4 Planning Board hearing had convinced the Highway Department that there would be no problem and this belief continued until July when it learned otherwise. It is thus apparent that the traffic problem played no part in Atlas' determination to abandon Derwell. In any event there is no showing that this opposition could not have been overcome.

The requirement of a major change in the Comprehensive Development Plan was indeed an obstacle. But as plaintiff suggests Atlas invited this requirement by its presentation to the planning authorities. It recognized the desirability of promoting residential development in the area and expressed the belief that its facility "and the utilities which it will bring into the area south of I–95 will tend to stimulate residential growth of that area." It predicted that "once water is readily available from the mains serving the Atlas facility that the area * * * will likely be developed for residential uses." Thus Atlas represented that it would furnish a water supply sufficient to provide not only for its own needs but for the residential development of the area as well. The requirement of like provision for sewer facilities was not, in these circumstances, unreasonable. Moreover, it was foreseeable. A major change in the Comprehensive Plan was thus necessitated and this obstacle was of Atlas' own making.

Atlas cannot complain of an unforeseen expense involved in providing water and sewer for its facility. It not only failed to determine the availability of these utilities before entering into the contract but its conduct thereafter invited the conditions which the county imposed and the increased expense incident thereto. The mere increase in cost to Atlas, though substantial, did not render its undertakings impossible of performance, or excuse nonperformance. Safe Harbor Fishing Club v. Safe Harbor Realty Co., 34 Del.Ch. 28, 107 A.2d 635; Hudson v. D. & V. Mason Contractors, Inc., Del.Super., 252 A.2d 166.

■ Atlas contends that specific performance is a discretionary remedy which should be denied to plaintiff in the circumstances here appearing. It points to the fact that Derwell proved no damages. But failure to prove damages is not the test of plaintiff's entitlement to enforcement of a contract. The test is inadequacy of the legal remedy. Chavin v. H. H. Rosin & Co., Del.Supr., 246 A.2d 921. And "where the assessment of money damages is impracticable or somehow fails to do justice" the legal remedy is inadequate. Equitable Trust Co. v. Gallagher, 34 Del.Ch. 249, 102 A.2d 538. Here, in spite of testimony that the Derwell land had increased in value since the date of the contract, I am satisfied that any award of money damages would be speculative at best and, in all probability, would not provide adequate compensation. I say this because it would be difficult, if not impossible, to measure in money the effect on potential buyers of Derwell of the failure of Atlas to secure rezoning. Indeed that failure might well have the effect of rendering Derwell unsaleable, because potential buyers for industrial development would undoubtedly be wary of acquiring the land and the testimony indicates that there is little interest, if any, in residential development due to the lack of available utilities. The legal remedy available to Derwell is clearly inadequate.

■ Atlas next contends that specific performance should be refused because of the hardship imposed by county authorities in requiring a sewer system sufficient to accommodate the entire area. In similar circumstances the Supreme Court rejected such a contention in Craft Builders, Inc. v. Ellis D. Taylor, Inc., Del.Supr., 254

A.2d 233, where the court said: "We agree with the legal proposition that, as specific performance is purely an equitable remedy, it will not be granted when enforcement of a contract will produce undue hardship. * * * However, the remedy will not usually be denied where the hardship is due to defendant's own acts or is clearly foreseeable." Here, there is nothing in the contract which relieves Atlas from performance of its obligations if it should find that compliance is difficult, burdensome or expensive. And, as heretofore indicated, the hardship complained of was due to Atlas' own act, namely the presentation made to planning authorities, and was foreseeable.

Though the remedy of specific performance of a contract for the sale and purchase of land is more readily granted to the buyer than to the seller where the facts clearly indicate that enforcement of the buyer's obligation is the only just remedy available to the seller there is no room for the exercise of discretion by the court and specific performance must be granted. Such are the facts here and plaintiff is entitled to the remedy prayed for. Having so determined Atlas' counterclaim for refund of $12,500 of the deposit money is denied.

An appropriate order, on notice, may be presented.