**AUTOMOBILE CLUB OF SOUTHERN CALIFORNIA, Plaintiff–Counter–Defendant–Appellee,**

v.

**MELLON BANK (DE) NATIONAL AS-SOCIATION, Defendant–Counter–Claimant–Appellant.**

No. 99–56550.

D.C. No. CV–97–06785–CBM.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 3, 2001.

Decided Aug. 23, 2001.

Before HUG, DUHÉ,* and TALLMAN, Circuit Judges.

---

* John M. Duhe Senior Judge for the United States Court of Appeals for the Fifth Circuit,

## MEMORANDUM **

Defendant–Appellant Mellon Bank (DE) National Association ("Mellon"), appeals the District Court's summary judgment that Mellon initiated termination of its contract (the "Club Agreement") with Plaintiff–Appellee Automobile Club of Southern California ("ACSC") to issue credit cards bearing the ACSC logo and the District Court's summary judgment awarding ACSC $8,502,488.91 in damages. Because we hold that the district court erred when it concluded that initiation of termination of the Club Agreement required notice under Sections 26 and 31, we reverse and vacate both summary judgments and remand.

## BACKGROUND

In 1990, the American Automobile Association ("AAA") concluded a contract (the "National Agreement") with Mellon allowing Mellon to issue credit cards bearing the emblems of some of AAA's local clubs. The National Agreement required that Mellon also execute separate agreements with the local AAA clubs interested in the credit card program. Accordingly, Mellon on August 1, 1992, entered into the Club Agreement with ACSC, a local AAA member, which allowed Mellon to issue credit cards displaying ACSC's trademark and tradename. The Club Agreement provides that interpretation of its provisions shall be governed by Delaware and applicable federal laws. The Club Agreement had an initial term of five years and automatically renewed for one year terms thereafter.

Section 26(a) of the Club Agreement provides that either party "may terminate" the Club Agreement after its initial five year term elapses by giving the other party written notice at least 180 days before the expiration of the term. Section 26(a) provides that if the Club Agreement is terminated at Mellon's initiation, Mellon must pay to ACSC 20% of the "net positive premium amount" for the sale of ACSC's accounts. If Mellon and ACSC terminate the Club Agreement by mutual assent, then Mellon, under Section 26(a), must pay ACSC 10% of the "net positive premium amount." If ACSC initiates termination of the agreement, however, Mellon is not obligated to pay ACSC anything.

Section 31 elaborates Section 26(a)'s notice requirement for termination. Section 31 provides that any notice required or permitted under the Club Agreement must be in writing and hand-delivered or mailed by certified or registered mail. Section 31 also stipulates that any notice under the Agreement from ACSC to Mellon must, in order to be effective, be sent to a particular Wilmington, Delaware address and be copied to a particular Pittsburgh address.

In February 1995, AAA sought to form a financial services company ("FISCO") to channel financial services through some of its local clubs. AAA solicited Mellon's interest in FISCO through a Request for Proposal letter dated February 8, 1995, in which AAA asked Mellon if AAA's local clubs that had credit card agreements with Mellon could terminate their card agreements early in order that they might ink new agreements with FISCO. Responding to this letter, Mellon offered ACSC a proposed early termination agreement. ACSC did not sign it.

In January 1996, AAA decided to collaborate with PNC Bank ("PNC") in developing FISCO. Local AAA clubs wishing to participate in FISCO would, to gain their wish, have to conclude separate agree-

sitting by designation.

** This disposition is not appropriate for publication and may not be cited to or by the

courts of this circuit except as may be provided by Ninth Circuit Rule 36–3.

ments with PNC and terminate their existing agreements with Mellon. On January 31, 1996, Mellon wrote to ACSC concerning AAA's selection of PNC. In its January 31 letter, Mellon noted that AAA's selection of PNC "raises numerous questions concerning the future of" the Club Agreement, but confirmed Mellon's continuing adherence to the Club Agreement. On February 7, 1996, ACSC wrote Mellon that "based upon AAA's FISCO decision, [ACSC] does not intend to expend funds during 1996 for the acquisition of new ... accountholders.... [W]e do not feel it is a prudent use of joint marketing funds to acquire accounts at this time." Section 16(e) of the Club Agreement required ACSC to contribute $400,000 in 1996 for the solicitation and acquisition of new accounts.

Shortly thereafter, AAA contacted ACSC to see if ACSC would participate in FISCO. ACSC advised AAA in a February 23, 1996, letter copied to Mellon that "The [ACSC] desires to take advantage of the American Automobile Association National Financial Services RFP Special Condition, which offers clubs an 'early out' from their agreements with Mellon Bank. The Auto Club intends to transfer its credit card program from Mellon Bank to FISCO. We look forward to proceeding with the steps necessary for this transfer."

A few months later, Mellon advised ACSC that Mellon interpreted certain of ACSC's oral requests for termination and the February 23, 1996, letter as effective notice of termination of the Club Agreement and asked that ACSC formalize the termination by signing an enclosed termination agreement. ACSC did not sign the agreement, but suggested revisions that might induce ACSC's assent. Mellon revised the termination agreement as ACSC suggested and forwarded ACSC the revised version. ACSC, however, did not sign it.

Mellon continued to fulfill its Club Agreement obligations until October 1996, when Mellon agreed with PNC that PNC would purchase Mellon's portfolio of AAA-related accounts, including ACSC's account. Although Mellon and ACSC had commenced negotiations addressing their disagreements concerning the Club Agreement, Mellon sold ACSC's account to PNC before those disagreements were resolved. Mellon sold its portfolio of AAA-related accounts to PNC for $771 million.

Following the sale, ACSC sued Mellon to recover, per Section 26(a) of the Club Agreement, 20% of the "net positive premium amount" Mellon earned when it sold ACSC's accounts to PNC. ACSC argued that Mellon initiated termination—indeed, terminated—the Club Agreement through the sale of its AAA-related accounts. The District Court agreed and granted ACSC summary judgment. The District Court held that the Club Agreement was not terminated at ACSC's initiation because ACSC's various communications to Mellon concerning the Club Agreement were not notice sufficient to trigger termination under Sections 26 and 31. ACSC submitted a motion for summary judgment seeking an award of damages for Mellon's termination of the Club agreement. The District Court granted this motion, as well, and awarded ACSC $8,502,488.91 in damages. Mellon appeals those summary judgments.

## DISCUSSION

We review the district court's holding *de novo*. *Meade v. Cedarapids, Inc.*, 164 F.3d 1218, 1221 (9th Cir.1999).

■ The Club Agreement provides that "either party may terminate this agreement at the expiration of the current term for any reason, with or without cause, by giving the other party written notice at least one hundred and eighty days before

expiration of the term." The District Court held that this provision allows the parties to terminate the Club Agreement *only* by giving notice in the manner the agreement describes in Section 31. *See Automobile Club of Southern California v. Mellon Bank (DE) National Association*, No. CV 97–6785 (C.D.Cal. Sept. 25, 1998) (order granting summary judgment) ("Reading the Club Agreement as a whole, initiation of termination occurs when notice of termination is provided by a party"). The District Court implied, however, that means other than Section 31 notice-giving suffice to terminate the Club Agreement. *See id.* ("Although neither party provided effective notice of termination, Mellon actually effected termination of the Club Agreement when it sold the Club's accounts to PNC").

With this implication we concur. The Club Agreement states that either party "may terminate" the agreement by giving notice of termination in the manner required by Section 31. "May" here expresses permission or possibility. *See Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 204 n. 1, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985); BRYAN A. GARNER, THE ELEMENTS OF LEGAL STYLE 105 (1991). The Club Agreement permits and makes possible termination through Section 31 notice-giving. We do not construe the Club Agreement to make impossible termination by all other means. Indeed, the Club Agreement by its terms explicitly acknowledges at least one other possible means of termination— the parties' mutual assent. The Club Agreement, therefore, allows for initiation of termination by means other than notice of termination per Section 31.

■ In fact, it may have been terminated at ACSC's initiation. ACSC and AAA impelled the series of events that culminated in Mellon's sale of ACSC's accounts to PNC. AAA's selection of PNC as its partner in developing FISCO was the first event in this series. AAA's selection of PNC, Mellon correctly noted in its January 31, 1996, letter to ACSC, "raise[d] numerous questions concerning the future of" the Club Agreement.

ACSC's communications to Mellon in the month following AAA's selection of PNC answered those questions in the negative. On February 7, 1996, ACSC advised Mellon that ACSC planned to violate Section 16(e) of the Club Agreement by expending no funds during 1996 for the solicitation and acquisition of new cardholders. On February 23, 1996, ACSC copied Mellon on a letter from ACSC to AAA declaring that ACSC would pursue an "early out" from the Club Agreement, that ACSC "intend[ed] to transfer its credit card program from Mellon Bank to FISCO," and that ACSC in the future would "proceed with the steps necessary for this transfer."

ACSC, then, aware that AAA's selection of PNC as its FISCO partner worried Mellon with "numerous questions concerning the future of" the Club Agreement, informed Mellon in clear terms of ACSC's intention to withdraw from the Club Agreement and, true to its word, "proceed[ed] with the steps necessary" for withdrawal. That Mellon, with the sale of ACSC's accounts to PNC, concluded the process of withdrawal from the Club Agreement that ACSC began does not mean that the Club Agreement was terminated at Mellon's initiation. Rather, because ACSC's course of conduct in February 1996 made Mellon's sale of ACSC's accounts to PNC a near-fait accompli,[1] it

---

**1.** ACSC, in other words, repudiated its Club Agreement obligations. *See, for example, Sheehan v. Hepburn*, 138 A.2d 810, 812 (Del.Ch. 1958) ("An outright refusal of one party to a contract to perform the contract or its essentials constitutes such a repudiation as to entitle the other contracting party to treat the

may be that the Club Agreement was terminated at the initiation of ACSC.

The Club has filed a motion for sanctions and the Club and Mellon each filed motions for attorney's fees in connection with the motion for sanctions. All motions are denied.

## CONCLUSION

We reverse and vacate the District Court's orders of summary judgment and remand for further proceedings.

ALL MOTIONS DENIED, JUDGMENT REVERSED AND REMANDED.

---

contract as rescinded"); RESTATEMENT (SECOND) OF CONTRACTS § 253(2) ("Where performances are to be exchanged under an exchange of promises, one party's repudiation of a duty to render performance discharges the other party's remaining duties to render performance"). "Initiation of termination" conceptually resembles repudiation. Accordingly, our construction of the Club Agreement's provisions regarding "initiation of termination" reflects policies that inform Delaware law regarding repudiation. See 13 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 39:38 (4th ed. 1993) ("Anticipatory repudiation, in addition to being an excuse for nonperformance of contractual obligations

and conditions, is a breach of contract, which, like other breaches of contract, entitles the nondefaulting party to walk away from the contract without liability...").

