**AUTOMOBILE CLUB OF SOUTHERN CALIFORNIA, a California non-profit mutual benefit corporation, Plaintiff,**

v.

**MELLON BANK (DE) NATIONAL ASSOCIATION, a national banking association, and Does 1 through 20, inclusive, Defendant(s),**

**And Related Counter Claim(s).**

**No. CV 97–6785 SJO.**

United States District Court, C.D. California.

Dec. 22, 2003.

Diann H. Kim, Winston & Strawn, Los Angeles, CA, Kate Schneider Gold, Kaye Scholer, Los Angeles, CA, for Plaintiff.

Gerard P. Harney, Charles Edward Wheeler, Cozen & O'Connor, San Diego, CA, Frederick L. McKnight, Ricky L. Shackelford, Reed T. Aljian, Jones Day, Los Angeles, CA, James E. Robinson, Salvatore R Faia, Aaron Krauss, Cozen & O'Connor, Philadelphia, PA, Patrick J. O'Connor, Powell Goldstein Frazer & Murphy, Atlanta, GA, Huey Cotton, Cozen & O'Connor, Los Angeles, CA, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

OTERO, District Judge.

### I

### FINDINGS OF FACT

### INTRODUCTION

These Findings of Fact and Conclusions of Law are rendered pursuant to FRCP, Rule 52a. If any Finding of Fact should be a Conclusion of Law, it is so deemed. If any Conclusion of Law should be a Finding of Fact, it is so deemed.

Plaintiff Automobile Club of Southern California (hereafter "ACSC" or "Automobile Club") at all times was represented by Diann H. Kim and Wendy O. Clendening of Winston & Strawn, LLP. Defendant Mellon Bank (DE) National Association (hereafter "Mellon") was represented by Frederick L. McKnight, Ricky L. Shackelford and Reed Aljian of Jones, Day, Reavis & Pogue.

On June 10, 2003, the Court met with counsel to discuss the Final Pretrial Conference Order (hereafter "FPTO"), witness and exhibit lists and stipulation of exhibits offered at trial. Pursuant to the Pretrial Conference, counsel and parties confirmed their jury trial waiver and a FPTO was issued. Court and counsel agreed that the court trial would be conducted intermittently over several days in June and July to accommodate the previously set schedule of the Court.

The matter commenced regularly for trial on June 11, 2003 in Courtroom 1600 of the United States District Court, Central District of California, the Honorable S. James Otero, Judge Presiding. Closing arguments were presented on July 15, 2003.

Having carefully considered all the pleadings, documentary evidence, credibility of the witnesses and arguments of counsel, it is ORDERED, ADJUDGED AND DECREED that ACSC shall not recover on any of its claims and that Judgment be entered in favor of Defendant Mellon Bank (DE) National Association and against Plaintiff Automobile Club of Southern California on the complaint. IT IS FURTHER ORDERED, ADJUDGED AND

DECREED that Counter Claimant and Defendant Mellon Bank (DE) National Association have Judgment against Counter Defendant Automobile Club of Southern California for economic damages in the sum of $598,922, together with interest thereon commencing August 23, 1996 on the counter claim. Mellon is decreed the prevailing party and shall recover its reasonable fees and costs pursuant to § 37 of the Club Issuer Agreement (hereafter "CIA"). (Tri.Exh. 3)

## JURISDICTION

Subject matter jurisdiction is proper based on diversity of citizenship, pursuant to 28 U.S.C. § 1332(a). The evidence established that Plaintiff Automobile Club of Southern California has its principal place of business in Los Angeles, California. Defendant Mellon Bank (DE) National Association has its principal place of business in Greenville, Delaware. Pursuant to 28 U.S.C. § 1332(b), the amount in controversy exceeds the $75,000 jurisdiction limitation. Venue is proper, as a substantial part of the events giving rise to the parties' claims occurred in the Central District. 28 U.S.C. § 1391. (*See also*, CIA § 29 Tri. Exh. 3)

## THE PARTIES

Plaintiff ACSC is a non-profit mutual benefit corporation. Defendant Mellon is a national banking association.

## BACKGROUND

The background of this case is as follows.

This is a declaratory relief, breach of contract and breach of the implied covenant of good faith and fair dealing lawsuit brought by ACSC. Mellon filed an answer and counter claim against ACSC alleging, inter alia, breach of contract and failure to pay Mellon for services rendered following termination of the parties' contract. The precise claims of the parties are enumerated in the Final Pretrial Conference Order dated June 30, 2003. That Order is incorporated herein to this Court's Findings of Fact and Conclusions of Law.

On August 20, 1997, Plaintiff Automobile Club of Southern California filed suit in Los Angeles Superior Court against Defendant Mellon Bank following the dissolution of the parties' contractual agreement concerning credit card accounts and the sale of those accounts by Mellon to third party PNC Bank. The matter was removed by Mellon to the United States District Court for the Central District of California on September 11, 1997. The contract which is subject of the lawsuit is the Club Issuer Agreement. (Tri.Exh. 3)

The history of the litigation as referenced by court records, the Ninth Circuit opinion, exhibits and witnesses who testified at trial is long and tortuous.

### The Contracts: The AAA Issuer Agreement and The Club Issuer Agreement

In 1990, the American Automobile Association (hereafter "AAA") executed a contract (AAA Issuer Agreement Tri. Exh. 1) with Mellon, allowing Mellon to issue AAA—Visa credit cards bearing the AAA emblem with certain of AAA's local clubs. AAA and ACSC are related but legally separate entities. The contract was executed on September 28, 1990. The AAA issuer Agreement (hereafter "AIA") required that Mellon execute separate agreements with the local AAA clubs interested in the credit card program before Mellon could issue the AAA—Visa credit cards. Accordingly, on August 1, 1992, Mellon entered into the Club Issuer Agreement (CIA Tri. Exh. 3) with ACSC. The evidence established that ACSC is the local AAA member club for Southern California.

The CIA in conjunction with the AIA gave Mellon the right to issue, upon payment to ACSC, AAA–Visa credit cards displaying AAA's trademark and trade name to individual members of ACSC. The CIA had an initial term of five years and automatically renewed for one year terms thereafter. (CIA § 2 p. 1 Tri. Exh. 3)

There are certain provisions of the CIA that are relevant to the Court's Findings and Conclusions. These include without limitation, the following. First, the CIA contained a primacy clause wherein the parties recognized the primacy of the AIA. (CIA § 4 p. 3 Tri. Exh. 3) Although the CIA acknowledged the primacy of the AIA, termination of the AIA did not necessarily result in the termination of the CIA. Section 4 of the CIA provides: "If the AAA Issuer Agreement is terminated, the **Club shall at its sole option** and within (60) days of receipt of notice of such termination, elect in writing to Issuer [Mellon] whether to terminate or continue [the Club Issuer] Agreement." Section 4 of the CIA would be rendered meaningless if it is read not to grant ACSC the explicit right to continue the CIA. Second, the Club Issuer Agreement provided that, upon notification of termination of the CIA by ACSC, Mellon was required to **immediately cooperate** in the sale and transfer of the Automobile Club credit card accounts to such other financial institution selected by ACSC. (CIA § 26(b) p. 17 Tri. Exh. 3) Third, the CIA provided for a marketing expense budget which required Mellon and ACSC to contribute their full share of marketing funds covering the initial five year term of the contract. The amounts to be provided are referenced in § 16(e). Pursuant to § 16(e), in 1996 the Automobile Club and Mellon were each to contribute $400,000. Fourth, § 26(a) of the CIA provided that either party "may" terminate the Agreement after its initial five year term by giving the other party writ-ten notice at least 180 days before the expiration of the term. Section 26 allowed for **but did not preclude termination** by means other than by written notice referenced by § 31. Fifth, the CIA contained a premium sharing provision entitling ACSC to recover a portion of the net positive premium amount earned by Mellon, if ACSC's accounts were sold under certain conditions. Section 26(e) provided that if the Agreement was terminated at Mellon's initiation, then Mellon must pay to ACSC 20% of the net positive premium amount for the sale of ACSC's accounts. If Mellon and ACSC terminated the Club Issuer Agreement by mutual consent, then Mellon must pay ACSC 10% of the net positive premium amount earned. If ACSC initiated termination of the Club Issuer Agreement, then Mellon was under no obligation to pay any amount. Finally, even if Mellon initiated termination of the CIA, Mellon was excused from any obligation to pay if ACSC "committed fraud or [made] any material misrepresentation under the agreement." (*Id.,* § 2)

### The Summary Judgments

In 1998, the parties filed cross motions for summary judgment on the issue of who initiated termination of the CIA. The Honorable Consuelo B. Marshall, Chief Judge of the United States District Court—Central District granted ACSC's motions on liability and damages. ACSC was awarded $8,502,488.91 in damages plus interest. Mellon appealed and on August 23, 2001, the Court of Appeals for the Ninth Circuit reversed the decision. *Automobile Club of Southern California v. Mellon Bank (De) Nat'l Assoc.,* 17 Fed.Appx. 593, 2001 WL 966260 (9th Cir.2001) Accordingly, the matter was remanded to the District Court for trial. In March 2003, the case was randomly reassigned to Judge S. James Otero for trial. The parties, thereafter, waived jury.

## The Ninth Circuit's Decision

Counsel agree that the Ninth Circuit decision controls this case. (Opening Statements at trial of Ms. Diann Kim and Mr. Frederick McKnight, June 11, 2003) The Ninth Circuit found that the District Court erred when it concluded: (1) That Mellon initiated termination—indeed, terminated—the Club Issuer Agreement through the sale of its AAA-related accounts to PNC Bank; (2) that the Club Issuer Agreement was not terminated at ACSC's initiation because ACSC's various communications to Mellon concerning the CIA were not notice sufficient to trigger termination under §§ 26 and 31. (*Id.* at 594) Rather, the Ninth Circuit held that, the CIA allowed for initiation of termination by means other than written notice under §§ 26 and 31. (*Id.* at 596) Additionally, the Court refocused the issue on which party may have initiated termination of the CIA, and it supported its reversal of summary judgment with a review of the evidence that could allow a trier of fact to conclude that it was ACSC, not Mellon, that impelled the series of events that culminated in Mellon's sale of ACSC accounts to PNC Bank. (*Id.* at 597) [1]

## The Issues

Consistent with the Ninth Circuit's decision, counsel agree the main issues before this Court on claims one through four and claims seven and eight of ACSC's amended complaint are: (1) whether the 1992 Club Issuer Agreement between Mellon and ACSC was terminated at the initiation of Mellon, terminated by mutual agreement, or terminated at the initiation of ACSC; (2) if terminated at the initiation of Mellon or by mutual agreement, whether Mellon received a premium for the sale of the ACSC-related accounts, and if so, what amount ACSC is entitled to receive from Mellon pursuant to § 26 of the Club Issuer Agreement; and (3) whether ACSC suffered any consequential damages because its accounts were sold to PNC Bank, and if so, in what amount. (FPTO, June 30, 2003)

As to ACSC's fifth claim for breach of contract, the parties have stipulated to resolve this fifth claim and Mellon's counter claim as follows:

(a) If ACSC recovers 20% of the net premium amount under § 26(e) of the CIA, then ACSC should receive $472,948 plus prejudgment interest from December 19, 1996 on its fifth claim and Mellon should recover nothing, on its counter claim;

(b) If ACSC recovers 10% of the net positive premium amount under § 26(e), then ACSC shall receive nothing on its fifth claim and Mellon shall recover nothing on its counter claim; and

(c) If ACSC recovers nothing under § 26(e) of the Club Issuer Agreement, then ACSC shall recover nothing on its fifth claim and Mellon shall recover $598,922 plus prejudgment interest from August 23, 1996 on its counter claim. (FPTO June 30, 2003)

In addition to the issues enumerated, the parties ask the Court to decide, among other things, whether ACSC's claims are barred by the doctrines of waiver, estoppel and unclean hands. In particular, Mellon contends that ACSC claims are barred because ACSC knew of the August 23, 1996 termination date and either expressly or impliedly gave up the right to dispute that date. Mellon also contends that be-

---

1. The Court's Findings and Conclusions were not influenced by the manner in which the Ninth Circuit refocused the issue of initiation of termination. The Court conducted an independent and thorough review of the evidence.

cause of ACSC's conduct, including material misrepresentations, ACSC is estopped from claiming that Mellon breached the Club Issuer Agreement because ACSC misrepresentations fell within the fraud exception of § 26 of the Club Issuer Agreement. ( *See,* CIA, Misrepresentation Exception, § 26(e) p. 19 Tri. Exh. 3) The misrepresentation exception in the CIA referenced by Mellon excuses obligation to pay under the agreement if the Automobile Club made material misrepresentations. (*Id.*)

## Trial Overview

Trial commenced on Wednesday, June 11, 2003, with opening statements by Ms. Kim and Mr. McKnight. ACSC opened its case in chief with the testimony of Mr. Peter McDonald, ACSC's Senior Vice President and the person who executed the CIA on behalf of ACSC. Mr. McDonald's testimony resumed on June 17, 2003 and June 18, 2003. ACSC presented deposition testimony of Mellon's Senior Vice President, Kerry Ryan. On June 19, 2003, ACSC offered deposition testimony of David Williams, PNC Bank's Vice President for Mergers and Acquisitions. ACSC then offered the testimony of Barbara Wilson, ACSC's Manager of Financial Services, and John Boyle, an ACSC executive who was involved in the CIA negotiations with Mellon Bank. After a one-week recess, Ms. Wilson was recalled on the morning of July 1, 2003, followed by testimony from Dr. Lacey Plache, ACSC's damages expert. ACSC rested its case, and Mellon filed a Rule 52 motion for judgment on partial findings. ACSC then filed its opposition to the motion.

Mellon commenced its case in chief with the testimony of ACSC Treasurer, Harold Mills. On July 2, 2003, Mellon called Mr. Kerry Ryan. On July 8, 2003, Mellon presented the deposition testimony of Mr. Jim Gudinas, AAA's Managing Director of Financial Services. Mr. Gudinas' deposition testimony was followed by the testimony of Mr. David Mowrey, Mellon's Associate Counsel and one of the lawyers who worked on the CIA. On July 9, 2003, the parties presented a stipulation regarding AAA's employee, Ms. Candice Bucy. The parties stipulated that if Ms. Bucy was called to testify, she would confirm that she had a telephone conversation with ACSC's Treasurer, Mr. Mills, and during the conversation he said "ACSC wants to enter the [FSCO] program as soon as possible." (Bucy Stip. p. 2) Mellon presented deposition testimony from PNC Bank's Vice President of Acquisitions, Mr. David Williams, followed by testimony from Mellon's employee, Mr. Gary Borawski. Mr. Williams was PNC's chief negotiator and negotiated with Mr. Borawski and Mr. Ryan on the premium to be paid in the transfer of the AAA accounts. Defendant then offered its damages expert, Mr. Michael Auriemma. On July 10, 2003, Mellon concluded its defense with the testimony of Mr. Leonard Heinz, Mellon's Assistant General Counsel. Mr. Heinz is Mr. Mowrey's supervisor and advised Mr. Ryan concerning the CIA.

The parties presented closing oral argument on July 15, 2003.

## AAA Forms a Financial Services Company (FSCO) and Solicits Mellon's Participation

The evidence established that in February 1995, AAA sought to form a new Financial Services Company (hereafter "FSCO") to provide financial services to its AAA local clubs. In this regard, AAA solicited bids from pre-selected banks in its effort to find a new national service partner. As part of this solicitation process, AAA issued a Request for Proposal (hereafter "RFP") to Mellon. (Tri. Testimony of Mr. McDonald) Mr. McDonald is the Senior Vice President of ACSC and

served on AAA's RFP FSCO task force. AAA's solicitation to Mellon is Trial Exhibit 5, which is a February 3, 1995 letter from James Gudinas Managing Director of AAA Financial Services, to Kerry Ryan, Senior Vice President of Mellon. The new FSCO was intended by AAA to be AAA's exclusive national services company. (Tri. Testimony of Mr. McDonald, *see also*, § 2 p. 12 Tri. Exh. 125) As part of the RFP, AAA required banks responding to the RFP to agree to a special condition whether the bank was selected as AAA's new financial partner. The special condition required participating banks (including Mellon) to provide AAA affiliate local clubs with an "early out" provision under which the local clubs, including ACSC, could terminate their agreements and programs with Mellon upon AAA's selection of a new service provider. (Tri. Testimony of Mr. McDonald; *see also*, p. 3 Tri. Exh. 5) Mellon also had to agree, if it responded to the RFP, to **immediately cooperate in the transfer of its existing ACSC credit card portfolio to the new FSCO partner**, should AAA select a bank other than Mellon. (Tri.Exh. 5) Pursuant to AAA's February 3, 1995 solicitation to Mellon, Mellon submitted a response to the RFP. In a letter dated February 22, 1995, Mellon wrote ACSC's Senior Vice President, Peter McDonald, informing him that Mellon hoped to become the new AAA FSCO partner and had agreed to AAA's "early out" provision. (Tri.Exh. 7) The "early out" provision was offered to ACSC in the form of a Proposed Termination Agreement (hereafter "PTA") (Tri.Exh. 8). It is without dispute that ACSC never signed any of the PTAs sent by Mellon. ACSC argued that because it did not sign the PTAs, that Mellon initiated termination of the CIA. (*See also*, ACSC's Proposed Findings and Conclusions, Finding Nos. 7, 8, 16–20; Conclusions No. 7) ACSC claims it was necessary for ACSC to sign the PTA for ACSC to accept the early out option. Because ACSC never signed, it never had the right and did not terminate the CIA.

Mellon's position is that it did not matter whether the clubs signed a termination agreement. Some clubs signed a termination agreement and some did not, but all were able to exercise the right to early termination regardless. (Tri. Testimony of Mr. Ryan, July 2, 2003 and Mr. Mowrey, July 8, 2003) Further, Mr. Ryan testified that the fact that ACSC never signed and returned a copy of the PTA was not a concern to Mellon because ACSC had sent its February 23, 1996 termination letter (Tri.Exh. 12) and did not object to Mellon's interpretation of that letter.

The Court is not persuaded by ACSC's claim regarding the PTAs in light of the totality of evidence that preponderates in favor of Mellon on the issue of initiation of termination. Moreover, as mentioned by the Ninth Circuit, the CIA clearly allows for initiation of termination by means other than formal written notice. *Automobile Club of Southern California v. Mellon Bank*, 17 Fed.Appx. 593, 596.

### ACSC Recognizes that AAA's RFP Process Presents ACSC with a Unique Opportunity

On May 1, 1995, Richard J. LaRosa, Mellon's Vice President of Credit Card Marketing, wrote to Mr. Peter McDonald and Mr. Harold (Hal) Mills of ACSC, again explaining that Mellon had agreed to the "early out" provision and offering a PTA. (Tri.Exh. 86) At trial, Mr. McDonald testified that when he received Mr. LaRosa's May 1, 1995 letter, he did not understand its significance. He said he referred the letter to Mr. Mills for review. The Court believes otherwise. Mr. McDonald's position with ACSC (*i.e.*, Senior Vice President and Chief Financial Officer), his service

commencing in 1994 as a board member on AAA's national RFP task force (Tri. Testimony of Mr. McDonald), his representation of ACSC in the execution of the CIA, his demeanor and responses to questions and other evidence discussed below suggest that long before AAA's selection of PNC Bank, Mr. McDonald recognized that the selection of a bank other than Mellon would trigger AAA's RFP "early out" condition and impel a series of events culminating in the sale by Mellon of ACSC's accounts. Having considered all of the evidence, the Court concludes that Mr. McDonald fully appreciated that AAA's selection of PNC Bank presented ACSC with a unique opportunity to terminate its relationship with Mellon, transfer its existing credit card portfolio to PNC Bank and recoup a 20% windfall of any net positive premium amount realized by Mellon in the sale of ACSC's accounts.[2] This could be achieved if Mellon initiated termination of the CIA. If, however, ACSC terminated, Mellon was under no obligation to pay any amount. (CIA § 26(e) Tri. Exh. 3)

## AAA Passes on Mellon and Selects PNC Bank as its New FSCO Partner

In January 1996, AAA passed over Mellon and selected PNC Bank to be its new national financial service provider. (Stipulated Facts, FPTO p. 3) At trial, Mr. McDonald testified that at the time of PNC Bank's selection, ACSC did not know if it would terminate its relationship with Mellon because ACSC did not have enough information to determine whether joining the FSCO was in ACSC's best interest. As mentioned, the evidence indicates otherwise. First, ACSC's Chief Financial Officer, Mr. McDonald, was a member of AAA's RFP task force (hereafter "TF") long before AAA's selection of PNC Bank, when the application process for the FSCO partnership began in 1994. The focus of the task force was the development of RFP criteria for the eventual selection of the AAA partner. Mr. McDonald's position on the TF suggests he was privy to strategic financial and other data gathered by the TF concerning strengths and weaknesses of each potential banking partner. (*See*, Tri. Exh. 5 pp. 2–3 for financial data required from each bank) AAA only invited 10 to 12 banks to enter the FSCO contest including PNC Bank and Mellon. (Tri. Testimony of Mr. McDonald) Data gathered by the TF would have provided ACSC, via Mr. McDonald, with information as to which bank best suited ACSC's business plan. Second, long before the selection of PNC Bank, Mr. McDonald had already focused his attention on the consequences of early termination of the CIA and what premium payment could be achieved if another bank were to receive the FSCO partnership. In a February 24, 1995 confidential memorandum[3] to ACSC's Treasurer, Mr. Mills, Mr. McDonald prophetically writes, "what happens if Mellon is not successful in the bid and another financial institution takes over the portfolio?" (Tri.Exh. 66) Third, ACSC is the largest of AAA's clubs. One reason Mr. McDonald was placed on AAA's RFP task force, was because he represented the AAA local club with the most members. The Court finds it highly unlikely that AAA would end its relationship with Mellon and select PNC Bank as its partner if it was not confident that ACSC would join the FSCO—PNC Bank venture. At the very least, the AAA FSCO task force un-

---

2. ACSC claims that PNC Bank paid Mellon a premium of $40,117,147 and that ACSC is entitled to 20% or $8,023,429 (ACSC Proposed Finding of Fact No. 31).

3. The confidential memorandum was written by Mr. McDonald almost a year prior to the selection of PNC Bank.

derstood AAA would lose considerable leverage with any financial provider if AAA entered a new strategic partnership that did not include its largest affiliate club.

## ACSC Initiates Termination of the Club Issuer Agreement

The Court finds that AAA's January 1996 selection of PNC Bank as the new FSCO partner was the first in a series of events that culminated in the sale of ACSC accounts to PNC Bank.[4] Over the course of the months following the PNC Bank selection, several rounds of written correspondence and conversations occurred between ACSC and Mellon regarding the Club Issuer Agreement. On January 31, 1996, just two days after AAA announced the selection of PNC Bank, Mellon's Vice President, Richard LaRosa, wrote Mr. Mills, Treasurer of ACSC, noting that the selection of PNC Bank "raise[d] numerous questions regarding the future of our joint credit card program" and asking that ACSC advise Mellon "...as quickly as possible...the direction that your club will be taking." (Tri.Exh. 10) Mr. LaRosa's letter was sent to Mr. Mills because he was the primary contact for Mellon at ACSC. (Tri. Testimony of Mr. Ryan) On February 7, 1996, a week following Mr. LaRosa's letter to Mr. Mills and seemingly in response to the LaRosa letter, Mr. Mills sent the first in a series of ACSC communications signaling ACSC's termination of the CIA. (Tri.Exh. 11) In his February 7, 1996 communication, Mr. Mills informed Mellon that **"based upon AAA's FISCO decision"** the ACSC did not intend to

honor § 16(d) of the CIA, requiring ACSC to expend in 1996, $400,000 in marketing funds for the credit card program. At trial, ACSC witnesses Mr. McDonald and Ms. Barbara Wilson testified that the February 7, 1996 letter was not intended as a repudiation of the CIA but was merely the reflection of the companies' "mutual" business decision that marketing funds should be diverted from new account acquisition to account stimulation. (Tri. Testimony of Mr. McDonald and Ms. Wilson) However, Mellon's Senior Vice President, Kerry Ryan, testified otherwise. He stated that the letter was confirmation of a telephone conversation he had with Hal Mills concerning the parties' agreement to mutually waive marketing fund expenditures in light of ACSC's decision to transfer the accounts to PNC Bank. (Tri. and Depo. Testimony of Mr. Kerry Ryan) The Court believes the testimony of Mr. Ryan over that of Mr. McDonald. On February 23, 1996, Mr. Mills again communicated with Mellon by sending Mr. Ryan a copy of a letter ACSC sent to AAA. This communication is highly significant in the chain of evidence, preponderating in favor of Mellon, on the ultimate fact at issue, *i.e.*, whether the CIA was terminated at the initiation of ACSC within the meaning of the Club Issuer Agreement and as further defined by the Ninth Circuit in *Automobile Club of Southern California v. Mellon Bank.* The February 23, 1996 letter states: **"The Automobile Club of Southern California desires to take advantage of the ... RFP Special Condition, which offers clubs an 'early out' from their agree-**

---

4. ACSC claims that Mellon's decision to voluntarily respond to AAA's RFP was the event that impelled the sale of ACSC's accounts to PNC. (ACSC's Conclusions of Law, No. 2) The Court concludes otherwise. The initial term of AIA expired on March 27, 1995, and after that time either AAA or Mellon could give the other party a six month notice of termination

of the Agreement (Tri. Exh. 1 p. 1) Therefore, Mellon's entry into the RFP "contest" was not the initiation of termination because entering the RFP did not grant AAA a right to terminate what it did not already have. In addition, as mentioned earlier, even if the AIA was terminated, the CIA was not necessarily terminated.

ments with Mellon Bank." Mr. Mills goes on to state: "The Auto Club intends to transfer its credit card program from Mellon Bank to FISCO." (Tri. Exh. 12) At trial, Mr. McDonald attempted to explain away ACSC's February 23, 1996 repudiation of the CIA. He testified that the letter was merely a response to a "AAA straw poll" and "intended as expression of only possible future action and not as notice of termination." [5] Mr. McDonald's testimony that the February 23, 1996 letter was not intended as initiation of termination is difficult to accept in light of all the evidence and when placed in the context of his responses to questions elicited during cross examination. For example, on cross examination, Mr. McDonald admitted that Exhibit 12 does not say that ACSC only possibly intends to transfer its credit card portfolio. (Tri. Testimony of Mr. McDonald, 51:22–25) Mr. McDonald agreed that there is nothing in Exhibit 12 that equates intent with no commitment. (Tri. Testimony of Mr. McDonald, 52:11–13, 53:2–4) He acknowledged that he did not even inform ACSC's own lawyers of his intentions before or during the drafting of Exhibit 12. (Tri. Testimony of Mr. McDonald, 57:2–8) Finally, Mr. McDonald admitted that he had an unexpressed understanding that ACSC had not committed to transferring its accounts although internal memos unequivocally state otherwise. (Tri. Exh. 201; Tri. Testimony of Mr. McDonald, 59:6–25)

ACSC's written statement of repudiation was coupled with a telephone conversation in which ACSC told Mellon that ACSC wanted to end its relationship and transfer the ACSC accounts to PNC Bank. At trial, Mr. Ryan testified he had a telephone conversation with Mr. McDonald sometime in late January, early February 1996 wherein Mr. McDonald informed Mr. Ryan that although ACSC had a good relationship with Mellon, it was in ACSC's best interest to join the national program with PNC Bank. (Tri. Testimony of Mr. Ryan) Regarding this telephone conversation, Mr. McDonald denied ever informing Mr. Ryan or anyone else that ACSC had decided to go with PNC Bank and not stay with Mellon. (Tri. Testimony of Mr. McDonald) Again, the Court finds Mr. Ryan to be the more credible of the two witnesses.

On April 26, 1996, Mellon sent another letter to ACSC, confirming that ACSC and not Mellon initiated termination of the CIA. In Mellon's April 26, 1996 letter, Mr. Ryan writes that the "purpose of the letter **is to acknowledge receipt of your Club's notice of termination** of our mutual Club Issuer Agreement for the ACSC Credit Card Program." Mr. Ryan goes on to state "we have received several **oral requests for termination from various ACSC officers** and we also received a copy of the attached letter dated February 23, 1996, addressed to Jim Gudinas at AAA. [The referenced letter is Trial Exhibit 12.] **We have construed these efforts to be timely and effective notices of termination by your Club per the terms of the attached Termination Agreement.** Please sign a copy of this agreement and return it to my attention." (Tri.Exh. 14) The PTA was signed by Mellon but not signed and returned by ACSC. The Court finds it was not necessary for ACSC to sign the PTA to initiate termination of the CIA because means other than CIA § 31

---

**5.** ACSC also claims that the February 23, 1996 letter was not notice of termination because it differs from the clear and express language of termination found in 36 other club notices. (Tri. Exh. 358, *e.g.,* Tri. Exh. 538) The Court finds this argument unconvincing as there are as many ways to say you are sorry as there are to communicate termination of an agreement.

notice giving, suffice to terminate the Club Issuer Agreement. (*See, Auto Club v. Mellon Bank, supra* at 596) The Court concludes that ACSC did not sign any of the PTAs, because ACSC believed that AAA's selection of PNC Bank presented the Automobile Club with the opportunity to join AAA's FSCO and recoup a premium amount Mellon would realize in the sale of the accounts; if Mellon sold the accounts without written communication from ACSC, pursuant to § 26 and § 31 of the CIA. The Court finds that ACSC recognized that AAA's selection of PNC Bank imposed a time sensitive decision process on both ACSC and Mellon. AAA's selection of PNC Bank triggered § 17 of the AIA and the "early out condition" which required that Mellon "immediately" cooperate with AAA and participating member clubs in the transfer of accounts. (Tri. Exh. 1 § 17) While Mellon's fate with AAA was clear after PNC Bank was selected, Mellon's relationship with ACSC was not. Section 4 of the CIA provides that "If the AAA Issuer Agreement is terminated, **the Club shall, at its sole option and within sixty (60) days of its receipt of notice of such termination, elect in writing to issuer whether to terminate or continue this Agreement.**" (Tri.Exh. 3) The PTA offered by Mellon extended the 60 day period to 90 days. (Tri.Exh. 8) Thus, because AAA selected PNC Bank as its FSCO partner on January 29, 1996, the right for ACSC to exercise the early out expired on April 28, 1996. (Tri. Testimony of Mr. Heinz) The evidence establishes that ACSC not Mellon initiated termination of the CIA. Mellon reasonably and in good faith believed that ACSC had sent a copy of its February 23, 1996 letter to Mr. Kerry Ryan of Mellon pursuant to § 4 of the CIA. (Tri.Exh. 12) The February 23, 1996 letter was authored by Mr. Harold Mills, an officer and the Treasurer of ACSC and a person who had regular communications with Mr. Ryan concerning the CIA. Any ambiguity regarding ACSC's intention was removed with Mellon's letter of April 26, 1996 to ACSC's President and CEO, Mr. McKernan. In the April 26, 1996 communication previously referenced, Mr. Ryan writes: "**The purpose of this letter is to acknowledge receipt of your Club's notice of termination of our mutual Club–Issuer Agreement...We regret the loss of your Club's business....**" (Tri.Exh. 14) How could Mr. Ryan have been clearer in informing ACSC that Mellon understood it had lost ACSC's business? If ACSC had not already made the decision to terminate the CIA as it would have this Court believe, would Mr. McKernan not have informed Mr. Ryan that ACSC had not terminated its relationship with its banking partner? Incredibly, ACSC never timely responded to Mellon's April 26, 1996 letter. In fact, it was not until August 23, 1996, the termination date itself, that ACSC first notified Mellon that it did not agree with the August 23, 1996 date. (Tri.Exh. 27) Prior to ACSC's August 23, 1996 letter, Mellon had no cause to believe ACSC questioned its initiation of termination. By this time, however, it was too late. On August 23, 1996, the date ACSC mailed the subject letter and six months after ACSC's February letter, the CIA came to an end.

Apart from the above written and oral communications, there were other significant actions by ACSC which further undermine Mr. McDonald's claim that the Club never decided to transfer its accounts from Mellon prior to the sale of those accounts by Mellon to third party PNC Bank. These include without limitation the following.

### 1) Internal Memorandum—Trial Exhibit 201

Trial Exhibit 201 is an ACSC internal memorandum dated May 20, 1996 from

Robert T. Bouttier, ACSC's Director, Marketing Division, to key ACSC personnel including Mr. Harold Mills and Mr. John Boyle. The Court finds this exhibit particularly damaging to Mr. McDonald's credibility. The memorandum announced that "ACSC will be **converting** both its Master-Card portfolio and its Vehicle Financing Program **to the PNC Bank programs**" and listed individuals who would be coordinating the conversion. Despite the memo's plain language, Mr. McDonald, nevertheless, claimed at trial that ACSC had not made any concrete decisions at that time to join PNC Bank. (Tri. Testimony of Mr. McDonald, June 17, 2003, Ct. Tri. 59:6–12) He also testified that he had an unexpressed understanding that the reference to conversion to PNC Bank made in the memo was not true. (*Id.* at 60:1–7, 60:13–20)

Mr. McDonald told the Court that the memorandum was merely a "management technique" designed to "focus the staff" on the possible transfer of accounts. (*Id.* at 57:9–18, 58:3–5, 61:11–15) He essentially testified that false information was given to ACSC management to keep them focused. Ms. Wilson's testimony was also offered to support Mr. McDonald's claim. She testified that the conversion team was created so that ACSC would know what they were dealing with. Ms. Wilson also claimed that the memorandum was not true because ACSC had not made any final decision whether to transfer its accounts to PNC Bank. (Tri. Testimony of Ms. Wilson, June 19, 2003, Ct. Tri. 31:1–12)

### 2) Avenues Magazine—Trial Exhibit 186

Trial Exhibit 186 is an article in the May—June 1996 issue of "Avenues" magazine, sent to all ACSC members. The article announced that "members will soon be able to obtain consumer loans and other new financial products as the Club participates in a national AAA financial services program." (Tri.Exh. 186) Ms. Wilson stated that the "other new financial products" that would soon be available to ACSC members could refer to any number of new things ACSC was starting. (Tri. Testimony of Ms. Wilson, July 19, 2003, Ct. Tri. 46:19–47:5) Mr. McDonald claimed the passage merely suggested a possible track that ACSC was pursuing and that no decision had been made. (Tri. Testimony of Mr. McDonald, June 17, 2003, Ct. Tri. 51:18–21; *but* 52:11–13) Mr. McDonald's interpretation of Trial Exhibit 186 is consistent with his contentions concerning the other inculpatory exhibits, but as with other exhibits, his view is inconsistent with the article's plain language. (*See, e.g.,* Exh. 12)

### 3) The PNC Club Call Entry and Bucy Stipulation

The PNC Club Call was a log where AAA employees made notes of telephone conversations regarding AAA's new credit card program. A portion of this log was read into the record but not admitted into evidence. The portion placed in the record was:

> Called Hal Mills, Treasurer, to discuss his understanding with Mellon regarding their ability to exercise the early out option even though ACSC did not sign last year. I asked him if they were comfortable with the fact that there would be **no premium due the club** since they sent their letter to Mellon Feb. 23 [Tri. Exh. 12] stating their desire to transfer their credit card portfolio FSC and take advantage of the early out. Hal said the club is aware of this and is comfortable. ACSC wants to enter the program **ASAP**.

(Exh. 148) In addition, the parties stipulated that if AAA employee Ms. Candice

Bucy was called to testify, she would confirm that she had a telephone conversation with ACSC Treasurer, Harold Mills, and that during the conversation he said **"ACSC wants to enter the [FSCO] program A.S.A.P."** (Bucy Stip. p. 2) The PNC Club Call and Bucy stipulation again draw into question Mr. McDonald's and Mr. Mills' credibility and ACSC's claim that it never decided to terminate the CIA.

#### 4) Conversion Kick–Off Meeting

Trial Exhibit 17 is a copy of the schedule of speakers and topics for the May 29, 1996 "PNC Conversation Kick–Off Meeting" at ACSC. The exhibit is additional proof that ACSC had already decided to transfer its credit card portfolio to PNC Bank.

#### ACSC's Misrepresentations Fall Within the Fraud Exception of the CIA

After sending a copy of its February 23, 1996 letter to Mellon (Tri.Exh. 12), ACSC was silent in the face of Mellon's clear understanding that ACSC had initiated termination of the CIA. As discussed, the Court does not believe ACSC's claim that it never decided to transfer its accounts to PNC Bank, but was forced to do so when on October 31, 1996 Mellon sold its portfolio without consent. However, assuming *arguendo* that ACSC had not decided which direction to take, ACSC nevertheless was required to inform Mellon of its position. By failing to timely notify Mellon that it disputed Mellon's interpretation of the February 23, 1996 letter, ACSC materially misrepresented its position.

#### What Mellon Believed and Communicated to ACSC

The evidence is clear that ACSC knew Mellon believed the February 23, 1996 letter was notice of termination. (Tri.Exh. 14) At trial, both Mr. Ryan and Mr. Mowrey testified that they believed ACSC had

taken the initiative in terminating the parties' agreement via its February 23, 1996 letter. (Tri. Testimony of Mr. Ryan, July 2, 2003; Tri. Testimony of Mr. Mowrey, July 8, 2003) They did not interpret the February 23, 1996 letter to be communicating only possible future action, but rather that ACSC would join AAA's FSCO and PNC Bank.

Moreover, Mellon's April 26, 1996 letter placed ACSC on notice that Mellon construed the February 23, 1996 letter as notice of termination. (Tri.Exh. 14) By plain language, Mellon made clear its belief that the Automobile Club had initiated termination of the CIA. The letter states:

> "The purpose of this letter is to acknowledge receipt of your Club's notice of **termination** .... We have received several oral requests for **termination** from various ACSC officers .... We have construed these efforts to be timely and effective notices of **termination**..."

In its letter, Mellon iterates its belief that ACSC had terminated the CIA. At trial, Mr. Ryan said he hoped the April 26, 1996 letter would make sure the parties were on the same page with respect to termination. (Tri. Testimony of Mr. Ryan, July 2, 2003) Indeed, although Mr. McDonald said that he did not share Mellon's understanding of ACSC's February 23, 1996 letter, he agreed that the April 26, 1996 letter notified ACSC that Mellon was construing their February 23, 1996 letter as notice of termination. (Tri. Testimony of Mr. McDonald) Nevertheless, ACSC never timely told Mellon that ACSC disavowed or needed to clarify its statements made in its February 23, 1996 communication, nor did it tell Mellon that Mellon's interpretation was misplaced.

Mellon's June 11, 1996 correspondence also informed ACSC that Mellon believed that the Automobile Club had initiated termination of the CIA. In this letter, Mr.

Ryan used ACSC's February 23, 1996 letter as a benchmark in Mellon's determination of August 23, 1996 as the termination date. (Tri. Exh. 19 p. 1) In the June 11, 1996 communication Mr. Ryan writes, "We have begun negotiations with PNC in the hope of transferring the ACSC portfolio prior to the August 23, 1996, termination date."

The evidence at trial also suggests that ACSC was aware that AAA managers shared Mellon's belief that ACSC's February 23, 1996 letter was effective notice of termination. For example, Mr. McDonald received a copy of AAA's May 13, 1996 letter which listed ACSC as a club that terminated its contract with Mellon on February 23, 1996. (Tri. Testimony of Mr. McDonald, June 18, 2003, 9:2–14; *see also* Tri. Exh. 16) Mr. McDonald also received a June 10, 1996 letter from AAA indicating that it was treating August 23, 1996 as the termination date. (Tri.Exh. 221)

### ACSC Fails to Timely Clarify Its Position

Although ACSC officers were aware of how Mellon and others interpreted the February 23, 1996 letter, they did nothing to correct what they now state was a misinterpretation of their position. Even after Mellon's April 26, 1996 letter was received, no action was taken to clarify ACSC's unexpressed interpretation of the February letter. In fact, it was not until August 23, 1996 that ACSC first wrote Mellon to inform it that ACSC did not agree the CIA terminated on August 23, 1996. (Tri.Exh. 27)

The Court inquired as to why, in light of Mellon's written communications, Mr. McDonald waited until the August 23, 1996 termination date to state in writing that ACSC expected Mellon to honor the terms of the CIA. (*See* Tri. Exh. 27) Mr. McDonald claimed that he thought he was keeping Mellon up to date but finally wrote Mellon because of the "tough position" Mellon was taking as to the August termination date. (Tri. Testimony of Mr. McDonald, June 18, 2003, Ct. Tri. 92:20–22) In the Court's view, Mr. McDonald failed to offer a credible reason why the August 23, 1996 termination date was deemed an important moment at which to send written notification to Mellon of ACSC's stance.

When asked whether, prior to August 23, 1996, ACSC had made any definitive statement to Mellon regarding its belief that Mellon was required to honor the CIA, Mr. McDonald referenced telephone conversations but stated there was nothing in writing to that effect. (Tri. Testimony of Mr. McDonald, June 18, 2003, Ct. Tri. 102:5–11) Further, Mr. Mills had no recollection of ever calling Mellon to let Mellon know ACSC did not intend to terminate the CIA, or that ACSC opposed the sale of its accounts to PNC Bank. (Tri. Testimony of Mr. Mills) While Mr. Mills was in regular contact with Mr. Ryan and Mr. LaRosa, he never set the record straight about the termination issue (*Id.*), and he did not provide the Court with any persuasive reason why he had not done so. (*Id.*)

### ACSC's Silence and Conduct Result in the Sale of the ACSC Credit Card Portfolio

The evidence established that ACSC did nothing to contradict Mellon's clear understanding that ACSC had terminated the CIA in February 1996. ACSC was silent for months before finally sending a letter on August 23, 1996, the date Mellon had said the CIA would terminate. (Tri.Exh. 27) ACSC's silence and conduct following AAA's selection of PNC Bank made Mellon's sale of the accounts a fait accompli. ACSC's written and oral statements, its failure to timely respond to Mellon's April 26, 1996 letter, the contractual duties imposed on Mellon under § 26(b) of the CIA

to immediately cooperate in the sale of ACSC's credit card accounts and AAA's early out condition left Mellon with little choice. Following ACSC's February 23, 1996 letter (Tri.Exh. 12), Mellon began the process of cooperating by commencing transfer of the ACSC accounts to PNC Bank as it was required to do. In reliance on ACSC's communications and silence, Mellon signed a confidentiality agreement with PNC Bank so that Mellon could exchange information relating to ACSC's accounts. (Tri.Exh. 160) Mellon permitted PNC Bank to conduct a due diligence and sent numerous documents on its credit card program to PNC Bank. (Tri. Exhs. 13, 21, 183, & 240) Mellon and PNC Bank also agreed to pricing terms of the portfolio. (Depo. Testimony of Mr. David Williams, June 12, 1998; Tri. Exh. 346)

The Court concludes that through its silence, statements and course of conduct, ACSC materially misrepresented its position, causing Mellon to justifiably rely which resulted in the sale of the ACSC credit card portfolio to PNC Bank. The Court finds that ACSC's silence and misrepresentations fall within the fraud exception of § 26(e) of the CIA. Mellon is therefore excused from any obligation to pay and ACSC is estopped from claiming that Mellon breached the Club Issuer Agreement.

## ACSC's Premium Claim and Alleged Damages

Since the Court finds that ACSC initiated termination of the CIA, it is not necessary for the Court to determine whether ACSC accounts sold at a premium. The Court notes, however, that although the evidence establishes that Mellon received a premium on the sale to PNC Bank of the entire AAA portfolio of the credit card accounts, which included the ACSC-related accounts, it is not clear that Mellon realized any premium on the sale of the ACSC-related accounts alone or that ACSC suffered any damages because of the sale.[6] (Tri. Testimony of Mellon's damages expert, Mr. Michael Auriemma; Deposition Testimony of David Williams, June 12, 1998, p. 32)

## Remaining Issues

Remaining issues for the Court to address are: (1) whether evidence was presented to support mutual termination[7] of the CIA, which would require Mellon to pay 10% of the net positive premium earned in the sale of the account portfolio to PNC Bank; and (2) whether Mellon has made legally binding admissions of its official position and is therefore estopped to deny that the selection of PNC Bank (i) constituted termination of the National agreement; (ii) required Mellon to sell the ACSC-related accounts; and (iii) led to the termination of the CIA. ACSC contends that Mellon asserted certain positions in its District Court brief concerning cross motions for summary judgment, and in argument before the Ninth Circuit on the appeal of the summary judgment. (*See* ACSC's Response to Mellon's Proposed Findings of Fact and Conclusions of Law) On the basis of these prior assertions, ACSC claims that Mellon is estopped from asserting that it was not contractually obligated to sell the AAA-related accounts.

On the issue of mutual termination, ACSC's primary witness, Mr. McDonald, testified that ACSC had not consented to termination of the CIA. (Tri. Testimony of Mr. McDonald) Moreover, Mellon's wit-

---

**6.** Dr. Plache's damages calculation ranges from an alleged low of $7,641,440 to a high of $18, 917, 318. (Tri.Exh. 604)

**7.** ACSC's alternative claim of mutual termination appears an afterthought since it was raised for the first time in ACSC's Post–Trial Proposed Findings.

nesses Mr. Leonard Heinz and David Mowrey also agreed that Mellon did not reach an understanding with ACSC to terminate the CIA by mutual consent within the meaning of § 26(g) of the CIA. (Tri. Testimony of Mr. Heinz and Mr. Mowrey) The Court concludes that ACSC failed to show by a preponderance of the evidence that ACSC and Mellon mutually agreed to terminate the Club Issuer Agreement.

In reference to ACSC's judicial estoppel claim, suffice it to say that ACSC appeared to abandon the claim at trial and failed to establish any of the prerequisites for application of the doctrine. (See generally, *New Hampshire v. Maine*, 532 U.S. 742, 121 S.Ct. 1808, 149 L.Ed.2d 968; *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990))

## CONCLUSIONS OF LAW

### The Applicable Law

Delaware law governs the parties' disputes concerning interpretation of the Club Issuer Agreement. (*Id.*, § 36)

California law governs all issues not involving interpretation of the Club Issuer Agreement, including ACSC's claim for breach of the implied covenant of good faith and fair dealing. *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1005–06 (9th Cir.2001), citing *Hurtado v. Superior Court*, 11 Cal.3d 574, 114 Cal.Rptr. 106, 522 P.2d 666 (1974).

### ACSC's Premium Claim

An essential element of ACSC's breach of contract claims against Mellon is that Mellon initiated termination of the CIA. The CIA could be terminated at any time at the initiation of ACSC or Mellon or by mutual consent. (CIA § 26 Tri. Exh. 3)

■ To initiate termination of the CIA, a party could give written notice or initiate termination by means other than written notice under § 26 and § 31. *Automobile Club of Southern California v. Mellon Bank (De) Nat'l Assoc.*, 17 Fed.Appx. 593, 595–96, 2001 WL 966260 *3 (9th Cir.2001).

■ The Club Issuer Agreement could be terminated at the initiation of either party including: (a) sending notice of its intent to terminate the CIA to the other party, *Automobile Club v. Mellon*, 17 Fed. Appx. at 595–96, 2001 WL 966260 *3, Club Issuer Agreement, § 26; (b) repudiating the CIA, *Automobile Club v. Mellon*, 17 Fed.Appx. at 595–97, 2001 WL 966260 *3–4; (c) failing to provide assurances that it would perform under and honor the CIA, Restatement (Second) of Contracts § 251(2); (d) making statements that it desired to end the CIA and begin a new relationship with another provider, *Pepsi–Cola Bottling Co. of Asbury Park v. Pepsico, Inc.*, 297 A.2d 28, 33 (Del.1972); (e) exercising in writing a right given to it in writing to terminate the CIA early, CIA, § 27, *United Aircraft Corp. v. Paul Hardeman, Inc.*, 204 A.2d 396, 403–04 (Del.Super.Ct.1964); or (f) acting or conducting itself in such a way (including remaining silent) that makes that party's desire to end the CIA known to the other party and the party ending the CIA is estopped to deny it initiated termination of the Agreement, *Timmons v. Campbell*, 111 A.2d 220, 224–25 (Del.Ch.1955).

### ACSC Initiated Termination by Giving Effective Notice of Termination of the Club Issuer Agreement

■ A party could give notice of termination of the Club Issuer Agreement in various ways. In order to be effective, a notice of termination was not required to comply with § 26 or § 31 of the Club Issuer Agreement. *Automobile Club v. Mellon*, 17 Fed.Appx. at 594, 595–96, 2001 WL 966260 *1, 3; *see also Hines v. New Castle County*, 640 A.2d 1026, 1029 (Del. 1994). If a party sent a notice of termi-

nation to the other party, the receiving party could waive any defects in the notice of termination. Waiver is the voluntary and intentional relinquishment of a known right. *Realty Growth Investors v. Council of Unit Owners,* 453 A.2d 450, 456 (Del. 1982); *Nathan Miller, Inc. v. Northern Ins. Co. of New York,* 39 A.2d 23, 25 (Del.Super.Ct.1944). A waiver may be made expressly or may be implied from conduct or other evidence. *Id.* The party alleged to have waived a right must have intended to give up a right. *Id.*

Section 31 of the Club Issuer Agreement does not require that notice be by hand or by registered mail to specified persons only. Section 31 provides one way of giving effective notice, but it is not the only way. *Automobile Club v. Mellon,* 17 Fed.Appx. at 594, 595–96, 2001 WL 966260 *1, 3.

ACSC's February 23, 1996 letter, a copy of which was sent to Mellon, constituted ACSC's notice of termination of the Club Issuer Agreement. Mellon treated ACSC's February 23, 1996 letter, its other writings, its conduct and its silence as initiation of termination irrespective of any provision of the Club Issuer Agreement. Mellon waived any defects in ACSC's notice of termination. *Realty Growth Investors,* 453 A.2d at 456; *Nathan Miller,* 39 A.2d at 25. The February 23, 1996 letter was an effective notice of termination and served as ACSC's initiation of termination of the Club Issuer Agreement.

The parties' conduct, including ACSC's silence, confirmed that ACSC initiated termination of the Club Issuer Agreement. *See Artesian Water Co. v. State,* 330 A.2d 441, 443–44 (Del.1974).

### ACSC Initiated Termination by Repudiating the Club Issuer Agreement and by Failing to Provide Assurances of Performance

■■ Repudiation is defined as a statement or action indicating an intention not to perform one's obligations under a contract or an intention to end or not to honor a contract. *Automobile Club v. Mellon,* 17 Fed.Appx. at 595–97, 2001 WL 966260 *3–4 n. 1; CitiSteel USA, Inc. v. Connell Ltd. P'ship,* 758 A.2d 928, 931 (Del.2000); *Johnson Forge Co. v. Leonard,* 51 A. 305, 308 (Del.1902); *Derwell Co. v. Apic, Inc.,* 278 A.2d 338, 342 (Del.Ch.1971); *Hartnett v. Baker,* 56 A. 672, 674 (Del.Super.Ct.1903).

■ Contract repudiation may also be defined as the failure to provide assurances of performance after such assurances have been requested. If, after receiving a request for further assurances of performance, a party to a contract does not provide any such assurances of future performance within a reasonable time, the party that requested the assurances may treat the failure to provide assurances as repudiation of the contract. Restatement (Second) of Contracts § 251(2).

■ When a party to a contract repudiates the contract, the injured party may treat the contract as terminated, even if the party that repudiated the contract urges the other party to continue performing. *CitiSteel USA,* 758 A.2d at 931; *Johnson Forge Co.,* 51 A. at 308.

By its February 23, 1996 letter, other communications, its conduct and its silence, ACSC repudiated the Club Issuer Agreement. ACSC's February 23, 1996 letter, other communications, its conduct and its silence indicated ACSC's clear intent to terminate the Club Issuer Agreement and "to transfer its credit card program from Mellon Bank to FISCO." It is irrelevant that ACSC had an unexpressed intention not to repudiate the Club Issuer Agreement by its February 23, 1996 letter, its other writings, its conduct and its silence. *Derwell Co. v. Apic, Inc.,* 278 A.2d

338 (Del.Ch.1971) ("But whatever may have been [the repudiator's] intent the language in which the letter was cast could only be construed as an unequivocal renunciation and anticipatory breach of the contract."); *Sampson v. Teligent, Inc. (In re Teligent, Inc.)*, 2001 WL 1134729 *6, 2001 Bankr.LEXIS 1226 *18 (Bkrtcy.S.D.N.Y. Sept. 26, 2001) (applying Delaware law and stating that "[t]he test is an objective one, and the Court must consider the promisor's communication in light of the facts and circumstances of the case"). Given the evidence offered and believed at trial, any reasonable person would have considered ACSC to have repudiated the parties' Agreement.

After AAA accepted PNC Bank's bid to become the financial provider for the FSCO program, and in light of that decision, Mellon sent its January 31, 1996 letter to ACSC, in which Mellon requested assurances from ACSC that ACSC would continue to perform under and honor the Club Issuer Agreement. In response, ACSC did not provide Mellon with assurances that ACSC would continue to perform under and honor the Club Issuer Agreement. Instead, ACSC wrote Mellon that it would not in 1996 contribute $400,000 in marketing funds required under the CIA and that it intended to transfer the ACSC-related accounts to PNC Bank. By failing to provide Mellon with assurances, ACSC repudiated the Club Issuer Agreement. Restatement (Second) of Contracts § 251(2).

Because ACSC repudiated the Club Issuer Agreement, Mellon was entitled to treat the Club Issuer Agreement as ended and to deem the repudiation as ACSC's initiation of termination. *CitiSteel USA,* 758 A.2d at 931; *Johnson Forge,* 51 A. at 308.

## ACSC Authorized the February 23, 1996 Letter

At the time he authored and sent the February 23, 1996 letter, Mr. Harold Mills was an officer of ACSC. At minimum, Mr. Mills had ostensible or apparent authority to send the February 23, 1996 letter. "Ostensible authority is such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess." Cal. Civ.Code § 2317. *See also Walsh v. Hooker & Fay,* 212 Cal.App.2d 450, 455–56, 28 Cal.Rptr. 16, (1963); Restatement (Second) of Agency, § 27 and cmt. a. Ostensible or apparent authority may be conferred through silence. *Id.,* § 43, cmt. c; *Bronson's Executor v. Chappell,* 79 U.S. 681, 683, 12 Wall. 681, 20 L.Ed. 436 (1870) (stating that agency "may be implied from circumstances. These circumstances are the acts of the agent and their recognition, or acquiescence, by the principal."). A third person can reasonably believe an agent is authorized to act based on prior course of conduct between the agent and that third person. *Walsh,* 212 Cal.App.2d at 455, 28 Cal.Rptr. 16; *Bronson's Executor,* 79 U.S. at 683, 686, 12 Wall. 681; Restatement (Second) of Agency, § 43(2).

The Court concludes that it was reasonable for Mellon to rely on the February 23, 1996 letter.

## ACSC Properly Exercised Its Right to Terminate the Club Issuer Agreement Early

Mellon granted ACSC a right to terminate the Club Issuer Agreement early. Mellon granted this right in writing. (Tri. Exh. 7) In return, ACSC exercised—in writing—its right to terminate early. In its February 23, 1996 letter, ACSC wrote that it "desires to take advantage of the ... Special Condition, which offers the clubs an 'early out' from their agreements with Mellon Bank." (Tri.Exh. 12) Mellon's

grant of the right and ACSC's exercise of it satisfy the requirements of § 27 of the Club Issuer Agreement.

■ In order to form a binding agreement, the parties to the agreement are not required to sign a formal written document or form. Correspondence between the parties can constitute a written and binding agreement, even in the absence of a formal contract. *United Aircraft Corp. v. Paul Hardeman, Inc.*, 204 A.2d at 403–04; *Clark v. Ryan*, 1992 WL 163443 *5 (Del.Ch. June 17, 1992); *N. Jacobi Hardware Co. v. Vietor*, 11 F.2d 30, 32 (4th Cir.1926).

### ACSC Is Estopped to Dispute That it Initiated Termination

■ The doctrine of estoppel is a doctrine of fairness that is applied to prevent injustice. *Delmar News. Inc. v. Jacobs Oil Co.*, 584 A.2d 531, 535 (Del.Super.Ct.1990). When the conduct or silence of a party to a contract intentionally or unintentionally leads the other party to the contract, in reasonable reliance on that conduct or silence, to change its position to its detriment, then the original party cannot enforce a contractual right contrary to the second party's changed position. *Waggoner v. Laster*, 581 A.2d 1127, 1136 (Del. 1990); *Timmons v. Campbell*, 111 A.2d 220, 224 (Del.Ch.1955). Reasonable reliance means that the party that changed its position must have lacked the means of knowing the truth about the facts in question. *Wilson v. American Ins. Co.*, 209 A.2d 902, 903–04 (Del.1965); *Delmar News*, 584 A.2d at 535.

■ Estoppel can be based on a party's silence. In other words, a party to a contract may be estopped from asserting a right under the contract if that party remained silent when it knew the other party to the contract was acting under a mistaken belief as to the silent party's position or intent with regard to the contract. *Delmar News*, 584 A.2d at 535; *Timmons*, 111 A.2d at 224–25.

ACSC is estopped from asserting that it did not initiate termination of the Club Issuer Agreement because ACSC did not tell Mellon in a timely way that ACSC did not intend or desire to terminate the Club Issuer Agreement even after ACSC knew Mellon believed that ACSC had initiated termination of the Club Issuer Agreement. Although ACSC attempted to dispute the termination date on August 23, 1996 (the actual termination date), ACSC broke its silence too late. *See Timmons*, 111 A.2d at 224–25.

### ACSC Made Material Misrepresentations and Has Unclean Hands Under the Club Issuer Agreement

■ One of ACSC's obligations under the Club Issuer Agreement was not to make material misrepresentations or commit fraud in connection with the parties' Club Issuer Agreement. (Club Issuer Agreement, § 26(e)) When a party has a duty to speak, but remains silent, the party's silence constitutes a material misrepresentation. Cal. Civ.Code § 1710(3); *Warner Constr. Corp. v. City of Los Angeles*, 2 Cal.3d 285, 294, 85 Cal.Rptr. 444, 466 P.2d 996 (1970); *Stephenson v. Capano Dev. Inc.*, 462 A.2d 1069, 1074 (Del.1983); *see also Glenn v. Tide Water Associated Oil Co.*, 101 A.2d 339, 342 (Del.Ch.1953). A party has a duty to speak when it makes a partial disclosure of facts that, without more, is misleading. Cal. Civ.Code § 1710(3); *Warner Constr.*, 2 Cal.3d at 294, 85 Cal.Rptr. 444, 466 P.2d 996; *American Trust Co. v. California Western States Life Ins. Co.*, 15 Cal.2d 42, 65, 98 P.2d 497 (1940) ("Regardless of whether one is under a duty to speak or disclose facts, one who does speak must speak the whole truth, and not by partial suppression

or concealment make the utterance untruthful and misleading."); *Stephenson,* 462 A.2d at 1074; *Murphy v. Berlin Constr. Co.,* 1999 WL 41633, *3 (Del.Super. Jan. 22, 1999).

ACSC made material misrepresentations in connection with the Club Issuer Agreement. If, as ACSC asserts, ACSC never intended to initiate termination of the Club Issuer Agreement, ACSC made material misrepresentations when, for example, ACSC made statements in writing and orally that ACSC desired to terminate the Club Issuer Agreement and desired to transfer the ACSC-related accounts to PNC Bank.

ACSC also made material misrepresentations when ACSC remained silent, and failed to clarify its position, when it had a duty to speak because it knew its February 23, 1996 letter was misleading and that Mellon believed ACSC had initiated termination of the Club Issuer Agreement. Cal. Civ.Code § 1710(3); *Warner Constr.,* 2 Cal.3d at 294, 85 Cal.Rptr. 444, 466 P.2d 996; *American Trust Co.,* 15 Cal.2d at 65, 98 P.2d 497; *Stephenson,* 462 A.2d at 1074; *Murphy,* 1999 WL 41633 *3.

Because ACSC made material misrepresentations, ACSC failed to perform all of its obligations under the Club Issuer Agreement, and, as a result, cannot state a claim for breach of contract. *Truitt v. Fahey,* 52 A. 339 (Del.Super.Ct.1902); *Emmett S. Hickman Co. v. Emilio Capaldi Developer, Inc.,* 251 A.2d 571, 573 (Del.Super. 1969) (required element of breach of contract claim is that plaintiff performed all of its obligations under the contract).

Because ACSC initiated termination of the Club Issuer Agreement, and in any event, because ACSC made material misrepresentations, ACSC has failed to state a claim for breach of contract against Mellon.

### Implied Covenant of Good Faith and Fair Dealing

ACSC also has failed to prove by a preponderance of the evidence its claim against Mellon for breach of the implied covenant of good faith and fair dealing. The implied covenant of good faith and fair dealing is a judicial invention designed to protect the spirit of an agreement when, without violating an obligation imposed by the agreement, one party to the agreement uses oppressive or underhanded tactics to deny the other party to the agreement the benefits of the parties' bargain. ACSC failed to prove that Mellon owed ACSC some duty separate and apart from the obligations created by the Club Issuer Agreement, and that Mellon's conduct involved an aspect of fraud, deceit, or misrepresentation. *Freeman & Mills, Inc. v. Belcher Oil Co.,* 11 Cal.4th 85, 44 Cal.Rptr.2d 420, 900 P.2d 669 (1995).

Even if the evidence established that Mellon breached a duty created by the Club Issuer Agreement, this would not have been sufficient for ACSC to prevail on its claim for breach of the implied covenant of good faith and fair dealing. *Id.*

### ACSC's Fifth Claim and Mellon's Counter Claim

Because ACSC is not entitled to 20% or 10% of any net positive premium amount under § 26 of the Club Issuer Agreement, ACSC shall recover nothing on its fifth claim and Mellon shall recover $598,922, plus prejudgment interest from August 23, 1996 on its counter claim. (FPTO June 30, 2003)

ACSC shall not recover on any of its claims.

Furthermore, the Court concludes that Mellon is entitled to its attorney fees and costs. (CIA § 37 Tri. Exh. 3) The parties are ORDERED to meet and confer and

agree on reasonable attorney fees and costs.

## CONCLUSION

When all is said and done, the case came down to the Court's assessment of the credibility of the witnesses and interpretation of the respective exhibits. Suffice it to say that Ms. Kim proved to be an exceptionally skilled trial lawyer, but was hampered by witnesses who told a story the Court found unconvincing.

IT IS SO ORDERED.